

# United States District Court

_____NORTHERN_____   DISTRICT OF   _____TEXAS_____

In the Matter of the Seizure of

A RED 2013 CHEVROLET CAMARO,
VIN# 2G1FZ3DP8D9804995

## APPLICATION AND AFFIDAVIT
## FOR SEIZURE WARRANT

CASE NUMBER: 3:13.MJ.537.BH

I <u>Richard C. Gardner</u> being duly sworn depose and say:

I am a <u>Special Agent with the Drug Enforcement Administration</u> and have reason to believe that in the Northern District of Texas there is now certain property which is subject to forfeiture in the United States, namely:

A red 2013 Chevrolet Camaro (VIN: 2G1FZ3DP8D9804995).

I believe that the property described is subject to seizure and that grounds exist for the issuance of this seizure warrant pursuant to 21 U.S.C. § 881, concerning violations of 21 U.S.C. §§ 841, 846, and 856.   The facts to support a finding of probable cause are as follows:

See attached affidavit

**Continued on the attached sheet and made a part hereof.**   **X** Yes   _____ No

Richard C. Gardner
**Signature of Affiant**

**Sworn to before me, and subscribed in my presence**

at   <u>Dallas, Texas</u>
**City and State**

Date:   August _23_ 2013

Irma C. Ramirez
**United States Magistrate Judge**

**Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS

I, Richard C. Gardner, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

### Introduction

1.      I have been employed as a Special Agent with DEA for over 15 years, and I am a "federal law enforcement officer" within the meaning of FED. R. CRIM. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.   I have received extensive training in drug trafficking and financial investigations involving proceeds derived from the sale of controlled substances.  During my experience as a DEA Special Agent, I have used a variety of methods to investigate drug related crimes, including, but not limited to, visual surveillance, witness interviews, the use of search warrants, confidential informants, undercover agents, pen registers/trap and trace devices, mobile tracking devices, and Title III wire interceptions.

2.      Based on the facts and circumstances contained in this affidavit, there is probable cause to believe that Barry Bays, and others, are conducting the sale of controlled substances or their analogues, in violation of 21 U.S.C. §§ 841, 846, and 856. Additionally, I have probable cause to believe that each of the assets contained in this affidavit were purchased with proceeds from the sale of controlled substances or their analogues; all of the funds contained in the accounts contained in this affidavit are the proceeds from the sale of controlled substances and/or are funds intended to be furnished

in exchange for controlled substances.  Therefore, I seek a seizure warrant for these funds based upon 21 U.S.C. § 881.

## Property to be Seized

3.      I make this application to obtain a seizure warrant for the following personal property:

      a.  A black 2012 Harley Davidson Sportster (VIN: 1HD1LF326CC424070);

      b.  A yellow 2012 Chevrolet Camaro SS (VIN: 2G1FK1EJ0C9155937);

      c.  A red 2013 Chevrolet Camaro (VIN: 2G1FZ3DP8D9804995);

      d.  A purple 2013 Dodge Challenger (VIN: 2C3CDYCJ5DH671948);

      e.  A purple 2013 Dodge Charger (VIN: 2C3CDXGJ8DH684701); and

      f.  All funds, monies, and other things of value held in any 1st Partners Federal Credit Union account under the member number ending in 4217.

4.      I have personally participated in the investigation below and I am familiar with the facts and circumstances through my personal participation, from discussions with other DEA agents and law enforcement officers, and from reviewing records and reports relating to the investigation.  Because this affidavit is for the limited purpose of securing a seizure warrant for the above accounts, I have not included details of every aspect of the investigation.

## Synthetic Cannabinoids

5.      The Controlled Substances Act (CSA) contains a drug analogue[1] statute that classifies chemical analogues of existing scheduled drugs as a scheduled drug in the same

---

[1]  A controlled substance analogue is defined as a substance which: (1) has a chemical structural

category.   As a result of this statute and the prevalence of marijuana analogues, on

March 1, 2011, DEA administratively placed five synthetic cannabinoids that were

commonly found in synthetic marijuana products (JWH-018, JWH-073, JWH-200, CP-

47,497, and Cannabicyclohexanol) in Schedule I of the CSA, which temporarily banned

them and their analogues for one year pending DEA and Food and Drug Administration

studies.   On February 29, 2012, DEA extended the Schedule I status of these substances

for six months pending the passage of a final regulatory ruling.

      6.      On July 9, 2012, the President signed into law the Synthetic Drug Abuse

Prevention Act of 2012 (SDAPA). SDAPA amended the Controlled Substances Act by

placing 26 substances in Schedule I. The list of legislatively scheduled controlled

substances is found at 21 U.S.C. § 812(c) and the current list of scheduled substances is

published at 21 C.F.R. § 1308. These initial schedules may be modified either by

legislation or by rulemaking.   The legislation also creates a new definition for

"cannabimimetic agents[2]," which creates criteria by which similar chemical compounds

can be controlled.

---

substantially similar to that of a controlled substance in Schedules I or II; (2) has a stimulant, depressant
or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that
of a controlled substance in Schedules I or II; or (3) a particular person represents or intends to have a
stimulant, depressant, or hallucinogenic effect substantially similar to or greater than that of a controlled
substance in Schedules I or II [21 U.S.C. § 802(32)].

[2] "Cannabimimetic agents", as defined in SDAPA are controlled under Schedule I and unless specifically
exempted or unless listed in another schedule, any material, compound, mixture, or preparation which
contains any quantity of the following substances, or which contains their salts, isomers, and salts of
isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific
chemical designation:

    a.  5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497);
    b.  5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol or
        CP-47,497 C8-homolog);
    c.  1-pentyl-3-(1-naphthoyl)indole (JWH-018 and AM678); 1-hexyl-3-(1-naphthoyl)indole
        (JWH-019);

7.    On December 21, 2012, DEA published a rule to establish drug codes for these substances, and to make technical and conforming amendments in accordance with SDAPA.

8.    DEA has also placed the following substances on a temporary listing of substances subject to emergency scheduling. Any material, compound, mixture, or preparation which contains any quantity of the following substances:

   a. 4-methyl-N-methylcathinone (mephedrone);

   b. 3,4-methylenedioxy-N-methylcathinone (methylone); and

   c. 3,4-methylenedioxypyrovalerone (MDPV)

9.    On May 16, 2013, DEA made the synthetic cannabinoids known as: UR-144, XLR11, and AKB48 Schedule I, illegal drugs under the Controlled Substances Act (CSA) for the next two years.   Part of the press release explained "These cannabinoids are often seen in so-called 'fake pot' products that are falsely marketed and sold as 'herbal incense' or 'potpourri' products on the Internet and by a variety of retail stores."

10.    In addition to the banned substances listed under the CSA, SDAPA, and DEA rules, 21 U.S.C. § 813 provides a "catch all" regarding controlled substance

---

   d. 1-[2-(4-morpholinyl)ethyl]-3-(1-naphthoyl)indole (JWH-200);
   e. 1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250);
   f. 1-pentyl-3-[1-(4-methoxynaphthoyl)]indole (JWH-081);
   g. 1-pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122);
   h. 1-pentyl-3-(4-chloro-1-naphthoyl)indole (JWH-398);
   i. 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201);
   j. 1-(5-fluoropentyl)-3-(2-iodobenzoyl)indole (AM694);
   k. 1-pentyl-3-[(4-methoxy)-benzoyl]indole (SR-19 and RCS-4);
   l. 1-cyclohexylethyl-3-(2-methoxyphenylacetyl)indole 7008 (SR-18 and RCS-8);
   m. 1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203) and
   n. 1-butyl-3-(1-naphthoyl)indole (JWH-073);

analogues.  According to § 813, if the controlled substance analogue is intended for human consumption, then the substance is to be treated as a controlled substance in Schedule I, for purposes of federal law.

Instant Investigation

11.    On May 30, 2013, investigators with the Denton Police Department (DPD) in Denton, Texas, and DEA executed a search warrant at 1209 Amherst Dr., Denton, Texas.  This warrant revealed a manufacturing location for synthetic cannabis consisting of: a garage with ping pong table with chemical residue, mixing equipment with chemical residue, empty and full cans of acetone, plastic bags for the shipment of chemicals with residue, face mask and spraying equipment[3].

12.    In addition to executing the search warrant at the Amherst location, DPD and DEA arrested Holden Bownds for violations involving the manufacture and distribution of synthetic cannabis.  Samuel Madeley was also found at the Amherst location during the warrant and was subsequently arrested on a felony warrant for delivery of a controlled substance (synthetic cannabis) out of Hood County, Texas.

13.    On June 17, 2013, DEA investigators met with Madeley at the Denton County Jail regarding his involvement in synthetic cannabis.  The main purpose of the meeting was to review the contents of Madeley's telephone in order for Madeley to identify individuals involved in the distribution of synthetic cannabis.  Madeley identified information contained in his "Smart Phone" of others involved in the manufacture and distribution of synthetic cannabis.  As identifications were made,

---

[3] These products are all used in the illegal production of synthetic cannabis.

Madeley would explain their activity and their importance as related to synthetic cannabis manufacture and distribution.

14.     According to Madeley, Madeley acted as a "broker" for the sale of synthetic cannabis chemicals used to manufacture synthetic cannabis and on some occasions would actually sell synthetic cannabis. Madeley explained that a few years ago, a Chinese supplier of synthetic cannabis chemicals put him in contact with Trenton Kaminski of TKO Unlimited. TKO Unlimited was located in Rosenberg, Texas, and sold the chemicals used to produce synthetic cannabis to manufacturers of synthetic cannabis.[4] Madeley explained his role was to discover and locate manufacturers of synthetic cannabis who needed the synthetic cannabis chemicals to spray on the smokable plant material. Madeley would then "broker" the sale between that customer and Kaminski. Madeley's commission would be between $500 and $1000 per kilogram of synthetic cannabis chemicals sold. Madeley is not sure how much synthetic cannabis chemicals he brokered for Kaminski, but said he received tax documents from TKO Unlimited which stated he earned approximately $32,000 from TKO Unlimited.

15.     Madeley explained that towards the middle of 2012[5], he received a telephone call from "Ron,"[6] about "brokering" synthetic cannabis chemicals for "Ron."

---

[4] On July 25, 2012, a federal search warrant was executed at 3902 Reese Rd, A200, Rosenberg, Texas. This was determined to be a smokable synthetic cannabinoid (SSC) manufacturing site for TKO Unlimited, LLC, operated by Trenton Kaminski as well as other co-conspirators. The search warrant revealed kilogram quantities of SSC product compounds, loose treated smokable SSC products, packaged SSC products, along with various other non-drug evidence.

[5] A search warrant was also conducted at another location of TKO Limited of Rosenberg Texas on August 1, 2012 by the Houston DEA Field Division and the Milwaukee DEA Field Division. According to Madeley, Kaminski fled the country for Belize after the search.

[6] "Ron" has been positively identified as Raunier Mendiluza residing in Florida through Madeley's phone records. Mendiluza is currently a DEA target in investigations involving the importation and sales of

Madeley said he then began brokering for "Ron" and continued brokering synthetic cannabis chemicals until Madeley was arrested in June 2013.

16.   Madeley said that one of his major customers that he brokered synthetic cannabis chemicals to was Barry Bays of B&B Distributing, located in Fort Wayne, Indiana. Madeley stated that he "brokered" the sale of different chemicals to Bays including, 5-F-UR-144, which is also known as XLR11.

17.   When Madeley was questioned as to how the synthetic cannabis chemicals were paid for and transported, Madeley stated the funds used to purchase the synthetic cannabis chemicals were wire transferred to Madeley's Bank of America checking account and that the synthetic cannabis chemicals were transported to Bays' by FedEx or UPS.

18.   Madeley was allowed to access his Bank of America account electronically and downloaded his bank statements in an electronic format to a DEA computer. Madeley and investigators then reviewed Madeley's deposits made between May 2012 through June 2013, and located the following wire transfers that Madeley identified as being from Bays' controlled accounts:

> a.   On August 16, 2012, Madeley received a $1,300 wire transfer deposit from the JPMorgan Chase bank account of Little Arm Inc[7] d/b/a B&B Distributing;

---

illegal chemicals used to produce smokable synthetic cannabis.

[7] According to publicly available records, Bays established Little Arm, Inc. according to the laws of the State of Indiana on October 11, 2011, as a for profit corporation using the trade names "B N B Distributions" and "B&B Distributions." Little Arm, Inc. was assigned corporation number 2011101200189 and listed a corporate address of 4914 Speedway Drive, Fort Wayne, Indiana.

b.  On August 20, 2012, Madeley received a $2,700 wire transfer deposit from the JPMorgan Chase bank account of Little Arm, Inc. d/b/a B&B Distributing;

c.  On August 20, 2012, Madeley received a $1,400 wire transfer deposit from the JPMorgan Chase bank account of Little Arm, Inc. d/b/a B&B Distributing;

d.  On August 21, 2012, Madeley received a $4,200 wire transfer deposit from the JPMorgan Chase bank account of Little Arm, Inc. d/b/a B&B Distributing;

e.  On August 21, 2012, Madeley received a $5,400 wire transfer deposit from the JPMorgan Chase bank account of Little Arm, Inc. d/b/a B&B Distributing; and

f.  On March 1, 2013, Madeley received a $10,000 wire transfer deposit from the JPMorgan Chase bank account of Little Arm, Inc. d/b/a B&B Distributing.

19.    Madeley explained that between the end of August 2012 through March 1, 2013, he (Madeley) grew tired of dealing with Bays due to the volume of chemicals Bays was purchasing and directed Holden Bownds to serve as the "broker" to continue to provide synthetic cannabis chemicals to Bays.

## Barry Bays' Previous Encounters with Law Enforcement

20.    On December 20, 2012, members of the Ft. Wayne Police Department (FWPD) executed search warrants at two Ft. Wayne, Indiana, locations: 2519 E. Tillman (Bays' residence) and 4914 Speedway (Bays' manufacturing and distribution location). A portion of probable cause detailed in the search warrant included the undercover purchase of synthetic cannabis from two locations in the State of Indiana branded "Street Legal," which were known to be manufactured by Barry Bays.  Laboratory results indicated the product purchased from both locations tested positive for XLR11, which is

currently a Schedule I substance, but at the time of the purchase was considered a controlled substance analogue and illegal under 21 U.S.C. §§ 802(32) 813, and 841.

21.     Investigators also conducted "trash pulls" from the discarded trash thrown away by Bays. Among other things located in the trash were discarded printed labels of "B2 Da Bomb," "Roses Air Freshener," and "Street Legal." Also recovered were discarded packages similar in appearance to the branded products purchased by the investigators. Other empty packaging recovered indicated the packaging formerly contained damiana leaf, and mullien leaf, both of which are known to me to be organic plant material commonly used in the manufacturing process of synthetic cannabis. According to the inventory from the search warrant of Bays' residence, investigators recovered various computers, containing numerous electronic business records of Little Arm, Inc. d/b/a B&B Distributing, in addition to numerous printed business records, which consisted of invoices from suppliers of the raw materials used in the process of manufacturing synthetic cannabis and cashier's checks representing the proceeds from the sale of synthetic cannabis. At the manufacturing facility additional business records were seized, both in the form of electronic media and printed media. In addition, investigators located approximately 1.4 pounds of a substance, which laboratory analysis concluded to be AKB48, at the manufacturing facility. AKB48 is currently a controlled substance, but at the time of execution of the search warrant, AKB48 was a controlled substance analogue and illegal under 21 U.S.C. §§ 802(32), 813, and 841.

22.     As part of the investigation into the activities of Bays, FWPD Detective Arrand Johnson conducted an interview of Bays on December 20, 2012. Bays was

advised of the FWPD Interview Advice of Rights.  Bays subsequently agreed to waive

those rights and agreed to speak to Detective Arrand.  Key points from the interview are

as follows:

    a.  Bays is the owner of Little Arm, Inc. dba B&B Distributing  and derives his
        income from the sales of his products;

    b.  Bays is currently using the chemical 5 Fluoro AKB 48 to spray on his
        products known by the brand names:  "Street Legal," "B2 Da Bomb,"
        "Roses," and "V8 Air Freshener;"

    c.  One kilogram of chemical usually costs about $4,000 per kilogram but can
        sell very cheap if the chemical is close to being banned, or the price is
        closer to $10,000 if the chemical is newly released.  In the recent past, Bays
        has obtained the chemicals through a person in Georgia that has the
        chemicals imported from China and shipped directly to Bays from China;

    d.  Bays has used chemicals known as AM2201, JWH 018, CP47, and 5F
        UR144(aka XLR11) in the past, but he has stopped using them as the State
        of Indiana or the DEA banned those chemicals;

    e.  Bays has disposed of chemicals that are banned in Indiana by selling those
        chemicals to a third party in Texas because the chemicals were not banned
        there;

    f.  Bays admitted to selling approximately $400,000 worth of product per
        month with a net profit of approximately $200,000.  Bays estimated that in
        2012 his net profit was approximately $800,000 from selling his products.[8]
        The $200,000 in currency seized from his safe located at 2519 E Tillman
        was a portion of Bay's profits from B&B Distributing;

    g.  Bays indicated knowledge of what people do with his product (referring to
        the fact people smoke or ingest the product) but contended he could not
        control how people use his product; and

    h.  Due to people mimicking his brands, Bays began assigning lot numbers to
        his products so that Bays could verify which kilogram of chemicals was

---

[8] As part of the information provided to Kelly Chevrolet in regards to Bays' purchase of a 2013 Chevrolet
Corvette (VIN: 1G1YW3DW7D5106531) was a Profit and Loss Statement for B&B Distributing created
by using Quickbooks On-line Plus which revealed B&B to have more than $2.3 million in gross sales
between March 1, 2012 and December 8, 2012.

used to produce a certain batch and could then match that batch with a lab report that Bays obtained from AIBiotech.

23.    Bays was originally charged by the State of Indiana as a felon in possession of a weapon and for possession of a controlled substance. The possession of the controlled substance charge was dropped due to the laboratory results concluding the chemical was not a controlled substance in the State of Indiana and Indiana does not have a statute similar to 21 U.S.C. § 813. Therefore the State of Indiana dismissed the controlled substance charge and Bays' valuables and records previously seized were returned to him. The two weapons recovered from Bays residence have been maintained as evidence in the current case involving Bays as a felon in possession of a firearm.

24.    According to the Chronological Case Summary maintained by the Allen County Indiana Superior Court, Bays was charged on April 19, 2013, in case number 02D4-1304-FB-000080 with an Indiana Class B felony of Unlawful Possession of a Firearm by a Serious Felon and an Indiana Class C felony of Possession of Synthetic Marijuana, and the case is currently scheduled for trial on November 5, 2013.

### "The Reviews" of Bays' Product

25.    While analyzing records from Bays' bank accounts an individual named David Muise was determined to be receiving wire transfers from Bays' account held at Wells Fargo bank. An internet search under the name David Muise revealed an individual operating under the name "Jay Muise-Legal High Guy" advertising "Legal High" T-shirts for sell by sending a money order to Davis A. Muise Jr. at 13 Mammoth Rd, Londonderry, New Hampshire. Also discovered was a website Muise was operating

located at http://thelegalhighguy.wix.com/legalhighguy.  This website is an advertisement by Muise to sell "herbal incense."  All six brands that Muise is selling are brands that have previously tested positive for either banned chemicals or their analogues by law enforcement.

26.     Also on the website is the following statement, "Hey, hey, hey, everyone! I'm David Allan Muises Jr. You all know me either as 'Jay Muise' as my alter ego, The Legal HIGH Guy!"  Further searches under You Tube videos for Jay Muise revealed several reviews for synthetic marijuana by Muise.  Muise has published videos relating to specific brands manufactured and distributed by Bays, such as:  "B2 Da Bomb," "Roses Air Freshener," "V8 Air Freshener," and "Street legal."

27.     On January 14, 2013, Muise published his review of "Roses Air Freshener (Http://youtu.be/6xchg1ahZve).  On January 21, 2013, Muise published his review of "V8 Air Freshener" (Http://youtu.be/U8YyPNPtrqA).  On February 1, 2013, Muise published his review of "B2 da Bomb Bubblegum" (Http://youtu.be/efXffcGDf1Y).  On February 28, 2013, Muise published his review of "Street Legal" (Http://youtu.be/tXcZFUcBju2g).  Three of these dates of publication compare favorably to the $500 wire transfers from Bays to Muise.

28.     Investigators have watched each of the "You Tube" videos referred to above and find them to be an "infomercial" for the brands of synthetic cannabis manufactured and distributed by Bays.  The following was observed by investigators when viewing the above identified videos published by Muise:

a. Muise smokes each of the products on camera and explains the "high" he is feeling;

b. Muise describes the intended "legal use" of the product but then demonstrates the product's actual use;

c. Muise explains the product is legal in 39 states and specifically mentions smoke shops where the products can be found.  Specifically identifying The Black Market of Anchorage, Alaska;

d. Muise explains that each of the products manufactured by B&B Distributing of Ft Wayne Indiana has 25 flavors each;

e. In one video Muise describes "Little Arm, Inc." as the owner of B&B Distributing;

f. Muise refers to "Barry" as the individual at B&B Distributing that Muise deals with; and

g. Muise provides the e-mail address of B&B Distributors as being BandBdis@gmail.com and to place your retail orders with that e-mail address.

### Undercover Sale to Bays

29.    Beginning on June 25, 2013, and concluding on July 19, 2013, the DEA

Dallas Field office conducted the sale of purported synthetic cannabis chemicals to Bays.

The sale consisted of the following:

a. On June 25, 2013, Sam Madeley sent a text to phone number 260-446-8971(Bays' phone) the message was as follows, "**Hey this sam. This is my new number. Call me when you get a chance. I need help liquidating my 5fpb.**"  The message was sent to Bays advising Bays that Madeley needed to liquidate chemicals used to produce synthetic marijuana.

b. Within a short period of time on June 25, 2013, at approximately 11:05 a.m., under the supervision of DEA Special Agent Dick Gardner and Sr. Inv. Charles Pearre, Madeley recorded a telephone call he received from Bays (260-446-8971), during which Bays tells Madeley that he (Bays) wanted to purchase five kilograms of either Cannabimimetic Agents BB22 or AB-PINACA.

c. After this telephone call, Agent Gardner assumed the role of Madeley in an undercover capacity for the purpose of "texting" Bays.

d. On June 25, 2013, Agent Gardner responded to a text message from Bays inquiring about the price with **"How much is a good domestic price for you?"** Bays responded with response asking Agent Gardner to set a price and Agent Gardner responded **"2500?"** Bays responded **"Is it the bb?"**

e. At this time Agent Gardner responded **"Its 5fpb22."** Bays responded **"No can't use pb need bb or ab."** Agent Gardner replied with **"Do you want bb22 or abPINACA?"** Bays responded, **"The second one," "Yes the piñata," "Damn auto correct,"** and finally **"Thanks."**[9]

f. Bays responded and sent the following text message **"Shoot me a $ on 5."** Agent Gardner then responded **"2300 ea for 5."** Bays then responded **"Ok when can I get it."** Agent Gardner then sent **"Wire $ tommorow nlt Friday."** Bays responded **"So I wire today I get it tmwr."** Agent Gardner understood this text message exchange to mean that Bays wanted 5 kilograms of the chemical ABPINACA.

g. On June 26, 2013, Bays sent the text message **"Hey buddy I wanted to run down to the bank are you up."** Agent Gardner waited over four hours before responding **"Sorry super busy. Send to: kerry woodson at acct: 1086487. Routing # 111911224. Justin state bank, 412 s. Highway 156 justin, Tx."**

h. No response was received from Bays so on June 28, 2013, Agent Gardner made contact with Bays with the following text **"Are you ok?"** Bays responded **"Yeah."** Agent Gardner then responded **"Checking after news reports."** Bays responded **"What news did you hear."** Agent Gardner replied **"Dea raids."** Bays responded **"Where didnt hear about it do you have link."** S/A Gardner responded with **http://thesmokesignal.com/operation-synergy-dea-raids-in-35-states-5-countries-target-synthetics/**

i. No contacts were made with Bays until July 11, 2013, when Bays sent the following message **"Hey you avalable I need an order buddy."** Agent Gardner did not respond. Then about 5 hours later Bays again sent a text **"Hey buddy you around".** Approximately 30 minutes later Gardner

---

[9] AB-PINACA is defined as a cannabimimetic indazole although not specifically listed as a Schedule I substance at this time, AB-PINACA would be considered a controlled substance analogue defined as a substance which has a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of a controlled substance in Schedules I or II 21 U.S.C. § 802(32)(A)(ii), thus in violation of 21 U.S.C. § 813.

responds with **"Sorry, been busy what do you need?"** Bays replies within the minute **"I need 5 from you how soon can I get it"**. S/A Gardner responds about five minutes later with **"I might be able to get it out on sat if the wire comes thru tomorrow."** Bays respond within four minutes by texting **"Ok send info and total."** Agent Gardner responds approximately 30 minutes later with **"$11,500 to Kerry Woodson at Justin State Bank, acct# 1086487. Routing 111911224."**

j.  On July 12, 2013, Bays texts, **"Ok and it's ab pinnica."** Agent Gardner does not respond. About an hour later Bays sends the text **"I need the city and state they are out of,"** and Agent Gardner does not respond. Bays then sends a text **"Is it Justin Texas?"** And again, Agent Gardner does not respond.

k.  In the afternoon of July 12, 2013, Agent Gardner receives confirmation from Justin State Bank that $11,500 has been received via wire transfer from Little Arm, Inc. sent through 1st Partners Federal Credit Union of Defiance, Ohio.

l.  At 4:30 pm on the afternoon of July 13, 2013, Agent Gardner sends Bays a text asking, **"Ready to send, what name and address do you want to use?"** Bays responds within the minute saying, "Bbd same address as before." Agent Gardner responds **"lost it,"** and Bays responds **"1503 Baltimore street defiance oh 43512."** Agent Gardner responds **"Ok"** and then breaks all communication with Bays.

m.  On July 15, 2013, Agent Gardner receives a text from phone number 260-715-2045 that states, **"Hey buddy this is Aaron with B&B. Barry wanted me to text you and see if you had an estimated eta on delivery date,"** to which Agent Gardner does not respond. Later Bays initiates contact via text saying **"Need tracking number for packages from you,"** and again Agent Gardner does not respond. Bays continues to text saying, **"You busy," "Getting worried buddy you around Sam,"** and **"Hello."**

n.  On July 17, 2013, Bays sends a text stating, **"Sam call me ASAP"** followed up with the text, **"Plz."** Agent Gardner does not respond.

o.  On July 19, 2013, Bays (260-446-8971) called Madely's phone (940-390-6439), which is being controlled by Agent Gardner in his undercover capacity, and leaves two voice messages. In these messages, Bays identifies himself and complains that he has not received his "chemicals, packages or tracking numbers."

## Recent Surveillance of Bays

30.      On July 27, 2013, the Indiana State Police observed a yellow 2012 Chevrolet Camaro (Indiana license plate RML342) and a purple 2013 Dodge Challenger (Indiana license plate 158AIV) located at Bays residence, 2519 E. Tillman, Ft. Wayne, Indiana.  Both of these vehicles are registered to Barry Bays at the Tillman address.

31.      On July 28, 2013, the Indiana State police observed approximately nine vehicles parked near the residence of Bays.  Several of these vehicles were registered to employees of Little Arm, Inc.

32.      On July 30, 2013, the Indiana Metropolitan Police Department obtained a search warrant to search a suspicious parcel being shipped through the FedEx Indianapolis distribution facility from "B.B.D. 1503 E. Baltimore, Defiance, Ohio" to "Hazy Daze 2104 Strand St, Galveston , TX"[10]  Inside the parcel was located over two kilograms of product known to investigators to be synthetic cannabis.  The synthetic cannabis was packaged in 1 – 10 gram packages sold under the name "B2 Da Bomb," "Street Legal," and "V8 Air Freshener."  Also contained in the parcel was a "lab report" which only contained page one of a two page report from Triad Forensics.  From other complete reports investigators have found in other investigations regarding synthetic cannabis, page one of the report contains the specifically banned chemicals used in the production of synthetic cannabis while page two contains the results of which chemicals which were actually detected.  The chemicals actually detected are those chemicals

---

[10] Hazy Daze has been identified in other DEA investigations as a "street level" distributor of synthetic cannabis.  Hazy Daze is owned by Shlomi Wolraich and was first identified as purchasing synthetic cannabis from Mark Sayegh of Phoenix, Arizona.  Sayegh is the owner of Greenlight Distributing a former manufacturer of "Bath salts and synthetic cannabis."

whose molecular structures have been altered in order to "get around" the ban but when ingested produce the same effects of marijuana, thus meeting the definition of a controlled substance analogue as defined in 21 U.S.C. § 802(32).

33.    Also inside the parcel was a letter bearing the signature of Bays affirming the chemicals contained in the product are not banned in the State of Indiana.  The invoice contained in the parcel contained the heading B&B Distributions, 1503 E Baltimore, Defiance, Ohio, and the phone number 260-446-8671 which checks to be addressed to Barry Bays at 2519 E. Tillman, Ft Wayne Indiana.

34.    Laboratory analysis conducted by the Indiana State Police Laboratory found the products seized by The Indiana State Police to be AB-FUBINACA.  AB-FUBINACA has been determined to be an emerging cannabimimetic agent by the DEA laboratory.  Although this chemical is not specifically listed as a "banned substance," AB-FUBINACA is considered an analogue of a banned substance and when intended for human consumption, possessing the substance is a violation of federal law.

### Bays' Money Laundering and Banking Activity

#### PNC Bank

35.    On April 6, 2011, Barry Bays established business checking account xxx0946 at PNC Bank under the name B&B Distribution, with Bays as the sole signature authority on the account.  An account analysis was conducted for the period of June 13, 2011, through May 2, 2012, and revealed numerous outgoing wire transfers totaling $251,150.45. All of the wires were going to the following entities:  Kagan Scott and

Nutregenomics,[11] Natures Uphoria, and Blue Sky International Brokers.  Additionally, the analysis revealed the following:

  a.  Significant purchases from Star West Botanicals;[12]

  b.  Activity in the account includes cash deposits and checks from businesses that investigators recognize as convenience stores, head shops, and smoke shops;

  c.  Debit activity consisted of purchases made at businesses specializing in the types of packaging used to package synthetic marijuana,  shipping boxes, electronic bill pay services,  businesses that sell the green leafy herbs used in the production of synthetic marijuana, businesses that sell the chemicals used to produce the synthetic marijuana, plus large payments to Kayle Boyer, Mark Rutherford, Melissa Slidack, and William Franklin all noted as commissions,[13] and transfers to other Bays' PNC accounts; and

  d.  Other withdrawals were made for the purchase of official checks payable to Barry D. Bays in the amount of $27,176.30 and to Star Financial in the amount of $82,000.

36.     During a conversation with one of the PNC tellers, Bays commented that he had found a cheaper source of supplies for manufacturing his products.  As early as October 2011, PNC bank employees were speculating that Bays was involved in the illegal distribution of K-2[14] and his deposits into the accounts were from those sales.

---

[11] Detective Michael Strickland of the Roswell Police Department, Roswell, Georgia, provided DEA with a copy of their investigation regarding Nutragenomics. The investigation revealed that Kagan Scott was an employee of Nutragenomics and that the Roswell Police Department had purchased through undercover means the synthetic cannabis chemical JWH-081 from Nutragenomics on July 10, 2010.
[12] Starwest Botanicals is a supplier of various types of green leafy smokable herbal products that are used in the manufacture of synthetic cannabis.  Their products and packaging have been located at the sites of numerous search warrants dealing with the manufacture of synthetic cannabis.
[13]   The memo "Commisions" on checks indicate these individuals are the sales persons for Bays and "commissions" are based on a percentage of sales. Thus large "commissions" indicate large sales.
[14] "K 2", "Spice", "potpourri" and "incense" are all slang terms for smokable synthetic cannabis.

37.    On January 19, 2012, PNC Bank records indicate that Bays made a $21,000 currency deposit, and then purchased a cashier's check for $43,268 made payable to Kelly Chevrolet[15].

38.    On March 4, 2012 Barry Bays purchased PNC Cashier's Check  871311 for $12,773.49 made payable to River City Harley Davidson.

39.    On April 4, 2012, PNC bank employees conducted an onsite visit with Bays at his manufacturing and distribution center, located a 4918 Speedway in Ft Wayne, Indiana.  Bays explained that he is still selling a proprietary line of "potpourri" being marketed as "B2 DaBomb," and "Street Legal."[16] Bays provided a thorough explanation of the business along with lab reports concerning chemical analysis of his products.[17] Bays told PNC during this visit that he fashions himself as the "Larry Flynt of the potpourri and herb industry."  Bays further explained that Kegan Scott and Blue Sky International Brokers are his suppliers/vendors.

---

[15] According to State of Indiana vehicle registrations Bays purchased a yellow 2012 Chevrolet Camaro SS bearing VIN: 2G1FK1EJ0C9155937 from Kelly Chevrolet of Ft. Wayne Indiana on January 19, 2012 and the vehicle is currently registered to Bays at 2519 E Tillman, Ft Wayne, Indiana. Records obtained from Kelly Chevrolet revealed that Bays purchased this vehicle with the above referenced Cashier's check and $4,775.16 in currency.

[16] "B2 Da Bomb" and "Street Legal" brands of smokable synthetic marijuana have been recovered in DEA search warrants executed in Maryland, North Carolina, Alaska, and New Mexico.  In addition, "B2 Da Bomb" was also recovered during the search warrant executed on the smoke shops owned by Robert Reaves of Wills Point Texas, who was previously mentioned in this affidavit.

[17] I have since learned, through the review of investigative reports in other DEA investigations, that manufacturers of products providing chemical analysis reports would be provided two separate laboratory reports.  The first report would be a true report identifying percentages, purities, and makeup of the synthetic cannabis identifying the analogue chemical.  However, the second lab report was designed so Bays could decide what substance shows up on the report, etc.  Through the information learned in various DEA investigations, it has been made clear that reports supplied to customers (smoke/head shops) by manufacturers were only included to make their product appear legal when truly it was an analogue of a Schedule I banned substance.

40.     In addition to maintaining the B&B Distribution business checking account with PNC Bank, Bays maintains several personal accounts at PNC, in which is he maintains sole signature authority on the account.  These include:

    a.   Personal checking account no. xxxxxx2974, which is comprised of transfers from Bays other accounts;

    b.   Personal checking account no. xxxxxx2982, which is comprised of transfers from Bays other accounts;

    c.   Personal savings account no. xxxxxx3002, which is comprised of transfers from Bays other accounts;

    d.   Personal checking account no. xxxxxx0946 was closed by PNC on June 5, 2012.  Bank records indicate Bays transferred $82,000 upon the closing to Star Financial Bank.

## JPMorgan Chase Bank

41.     Bays established business checking account xxx1292 with JPMorgan Chase Bank on May 5, 2012, under the name Little Arm, Inc.  Bays maintains sole signature authority on this account.  An analysis of the account was performed which revealed the following:

    a.   From March 1, 2012, through April 12, 2013, the deposit activity in the account totaled $1,871,665.  During this time frame the account was primarily funded by check deposits that were coming from various night clubs, Herbal Companies, Gas Stations, and Smoke Shops;

    b.   It was also observed the account has received wires into this account some of which were also received from Smoke shop type businesses;

    c.   Review of the cash deposits found several made that appear to have been structured.  An example of the activity found that on April 2, 2013, the Bays made a $9,980 cash deposit and the next day (April 3, 2013) another $9,900 cash deposit was made.  Several of these cash deposits appear to be broken up just beneath the Currency Transaction Report (CTR) threshold;

    d.   The debits to the account consisted of wires to individuals and businesses in China, debit card purchases, ADP, Fed-ex, various herbal and botanical

businesses and several large cash withdrawals (three valued well over the CTR threshold); and

e. On May 5, 2012, Bays exchanged $9,700 of $5 and $10 and $20 bills for $100 bills.

42.     In addition to the above mentioned transaction activity, a third party came in on Bays' behalf to make a $10,389 currency deposit into account xxx1292. When the bank teller explained a CTR would be required to be filed, the third party explained that the money was not his and called Bays. Bays informed the teller that "he has never had to do a CTR and was not going to start now." The third party then deposited an amount less than $10,000 so that a CTR would not be filed.

43.     According to other JPMorgan Chase records, bank employees reported to bank management that Bays openly explained that he had been recently raided by both the FBI and DEA, and Bays claimed they (law enforcement) were trying to shut him down for selling the legal form of synthetic marijuana. On another occasion, a bank employee stated Bays claimed that he was going to a convention where his product would beat the best "legal pot" there. Based on these comments and the records contained within Bays' accounts the bank recorded their concerns that Bays was possibly producing synthetic marijuana and not aroma therapy products.

<u>Wells Fargo Bank</u>

44.     Bays established savings account xxx2223 with Wells Fargo Bank on December 29, 2012. Bays had sole signature authority on this account. An analysis of the account was performed and the following activity was noted:

a. On December 31, 2012, Bays and Jennie Miller made a $21,362 currency deposit into the account. The bank identified Jennie Miller as the

production manager of Bays' B&B Distributions and also noted that Miller resides in the same residence as Bays;

b. During the period of time December 31, 2012, through May 6, 2013, Bays deposited $86,282 in currency into this account;

c. Three checks deposited between March 8, 2013, through May 9, 2013, totaled $207,500, each of which were from Bays' accounts at JPMorgan Chase Bank;

d. Wells Fargo Bank determined the "source of deposited funds is probably the manufacturing and distribution of illegal drugs;"

e. Several individual deposit amounts ranging from a low of $2,712 to a high of $10,000 were deposited at Wells Fargo bank branch locations in Virginia which is literally hundreds of miles from Bays' address in Indiana, but is in close proximity to one of Bays' distributors;

f. The cash deposits and the check deposits along with previously reported funds were then used to fund multiple cashier's checks purchased in between February 11, 2013, and May 13, 2013, totaling $296,300. The checks were issued to the US Treasury, Department of Revenue, a car dealership,[18] and an unidentified individual named Kathy Rice;

g. A review of Bays other accounts held at Wells Fargo revealed account#1057413930 and account #141502910 contained five cash withdrawals in between May 15, 2013 and May 24, 2013, totaling$56,280. The individual withdrawal amounts ranged from $3,770 to $31,000 and were actually used to fund cashier's checks that were all issued to Little Arms and deposited at another Bays' banking account held at Partner's First Federal Credit Union; and

h. Additional analysis of this account xxx2223 revealed a $5,000 wire transfer from Barry Bays to Holden Bownds on January 24, 2013. Three other wire transfers of $500 each were sent by Bays to David Muise. These transfers were wired on January 14, 2013, January 18, 2013, and January 24, 2013.

Huntington National Bank

45.    On April 26, 2013, Bays established Huntington National Bank business

checking account no. xxxxxx1290 in the name of Little Arm Inc. dba B&B

---

[18] According to the State of Indiana automobile registration records Bays purchased a 2013 Dodge Challenger SRT8 on March 20, 2013, and a 2013 Dodge Charger Super Bee on April 27, 2013, from Glenbrook Dodge located in Ft. Wayne, Indiana.

Distributions,.  An analysis of the account was performed from April 26, 2013, through

June 23, 2013, and the following activity was observed:

    a.  Credits to this account consisted of check deposits totaling $127,741.60. These checks consisted of cashier's checks remitted by Little Arm, Inc. and drawn on Chase bank, a cashier's check for $8,000 drawn on Wells Fargo Bank with no remitter listed, and checks from various retailers like Nightshift of North Webster Inc., Doobie's Alternative Gifts, Waking Dreams, Herb N Legend, Randy's Smoke-N-Holes LLC,[19] and small dollar amount money orders, among others for the apparent purchase of wholesale goods, and one cash deposit in the amount of $8,900; and

    b.  Debits from this account consist of debit card purchases totaling $30,189.93 at places like FedEx, U-line, and Triad Forensics,[20] one transfer to related checking account number 01041441520(opened by Bays on April 26, 2013 at Huntington)  for $43,562.79, one domestic wire transfer in the amount of $10,000 to Axess Trading Company,[21] two cash withdrawals in the amount of $1,100 and $10,000, one cashier's check purchased in the amount of $42,223.94 payable to Little Arm, Inc. (Ohio) and negotiated at Partners 1st Credit Union, and a debit memo for $3,729.75 upon account closure on June 13, 2013.

    46.    In addition to opening a business checking account at Huntington National

Bank, Bays established personal savings account xxxxxxx5155.  An analysis was

performed on the account from April 26, 2013, through June 23, 2013, which revealed

the following:

    a.  Credits to the account included one transfer from a related checking Huntington National Bank checking account xxxxxxx1520 for $7,927.44 and three cashier's checks with the remitter "Little Arm, Inc." and drawn on a Chase bank account totaling $46,734.81; and

---

[19] This businesses have been identified as customers of Bays, selling synthetic cannabis.
[20] Triad Forensics is one of the three known laboratories that produce a two page lab reports for customers. Page Two of the report contains what is in the product and page one of the report stating what is not in the product.
[21] Axess Trading Company is the company used by Raunier "Ron" Mendiluza to sell chemicals used to produce synthetic smokable cannabis.

    b. Debits from this account consist of one cashier's check purchased in the amount of $54,662.25, payable to Little Arm, Inc. (Ohio) and deposited at Partners 1st Credit Union.

47.     Other unusual transaction conducted by Bays at Huntington National Bank consists of:

    a. On April 26, 2013, Bays conducted a deposit in the amount of $70,000 ($65,000 to checking xxxxxxx1290 and $5,000 to savings xxxxxxx5155) consisting of seven cashier's checks in the amount of exactly $10,000 each that were remitted by Little Arm, Inc., payable to Barry Bays, and drawn on Chase bank;

    b. On May 15, 2013, Bays conducted a cash withdrawal from checking xxxxxxx1290 in the amount of $10,000;

    c. On May 15, 2013, Bays deposited a check to savings account xxxxxxx5155 in the amount of $41,734.81, consisting of two cashier's checks in the amounts of $30,793.88 and $10,940.93 that were remitted by Little Arm, Inc. and drawn on Chase bank; and

    d. On May 16, 2013, Bays deposited a $8,000 cashier's check, payable to Little Arm, Inc. which was drawn on Wells Fargo but did not have any remitter information on the check.  In addition, on May 16, 2013, Bays conducted deposited $8,900 in cash.

48.     Due to the risks presented to the bank, Huntington National Bank closed the accounts.

### 1st Partners Federal Credit Union

49.     On May 20, 2013, Bays established three accounts at the Partners First Federal Credit Union(CU) located in Ft Wayne, Indiana, with a branch location Defiance, Ohio.  The accounts at the CU consist of a share savings account, a business checking and a payroll account all titled in the name of Little Arm, Inc. under member number xxxxxxx4217, with Bays having signature authority.   Deposits into the savings and

payroll accounts consist primarily of transfers from the business account, while deposits into the business account consist of proceeds from the sales of synthetic cannabis.

50.     On July 12, 2013, the bank statement reflects a wire transfer of $11,500 to the Justin State Bank, which is the wire transfer relating to Bays' attempt to purchase five kilograms of chemicals from Special Agent Gardner.

51.     According to CU records, employees began to monitor Bays' banking activities due to some "suspicious activity."  The information obtained from employees of CU is summarized as follows:

- a. Bays informed a CU employee that Little Arm, Inc. does business as B&B Distributing and sells "spice;"

- b. Bays makes very large and multiple deposits consisting of credit card sales and checks from companies throughout the US.  Most of the checks deposited have a note on the memo line of the check that simply states "product;"

- c. Bays writes large even amount checks to people Bays' refers to as his "sales people."  These people include Aaron Parish, Kyle Boyer, Jared Coleman, and Dayna Wright;

- d. Bays makes many purchases at Fed-EX and UPS;

- e. In addition to the wire to Justin State Bank, Bays has made the following wire transfers to:

    - i) Clearfreight in the amount of  $3,868.81 for a shipping container;

    - ii) $41,000 to Joseph Jolly of Roswell , Georgia, for "fire retardant Chemicals;" and

    - iii) $16,000 to Axess Trading for "fire retardant chemicals."

52.     Investigators have reviewed many of the other debits to the account and discovered many purchases by Bays from companies that investigators know to provide the organic substances used in the production of synthetic cannabis.  These companies include:

      a.  Pacific Botanicals;

      b.  Tasty Puff;

      c.  Starwest Botanicals; and

      d.  Kaylyx.com

53.     A FinCEN search was conducted to determine if Barry Bays or Jennie Miller have been the subjects of Forms 8300 or Currency Transaction Reports (CTR). The search yielded many CTRs described as follows:

| Notable Currency Transaction Reports | | | | |
|---|---|---|---|---|
| Date | Individual Conducting Transaction | Account | Amount | Transaction Type |
| | | | | |
| January 9, 2012 | Barry Bays | PNC 2974 | $21,000 | Currency Deposit |
| January 12, 2012 | Barry Bays | PNC | $20,009 | Currency Exchange |
| March 19, 2012 | Barry Bays | PNC 2974 | $88,420 | Currency Deposit |
| May 4, 2012 | Barry Bays | PNC 0946 | $82,000 | Currency Deposit |
| September 10, 2012 | Barry Bays | JPMC 8913 | $120,000 | Currency Deposit |
| October 16, 2012 | Barry Bays | JPMC | $21,000 | Purchase of a cashier's Check |
| October 26, 2012 | Barry Bays | JPMC | $11,000 | Cash a cashier's Check |
| November 1, 2012 | Barry Bays | JPMC | $10,387 | Cash a cashier's Check |
| December 31, 2012 | Jennie Miller | WF 2223 | $21,362 | Currency Deposit |
| March 14, 2013 | Barry Bays | JPMC | $31,000 | Cash a cashier's check |
| March 29, 2013 | Barry Bays | JPMC | $50,000 | Cash a cashier's check |
| April 15, 2013 | Barry Bays | JPMC | $10,784 | Cash a cashier's check |
| April 18, 2013 | Barry Bays | JPMC | $10,892 | Currency Deposit |
| April 26, 2013 | Barry Bays | JPMC | $14,000 | Currency Deposit |
| April 30, 2013 | Barry Bays | JPMC | $26,370 | Cash a cashier's check |
| May 1,2013 | Barry Bays | JPMC | $14,938 | Currency Deposit |
| May 8, 2013 | Barry Bays | WF 2223 | $15,056 | Currency Deposit |

### Barry Bays' Purchases of High Value Assets

54.     Investigators have been unable to determine a legitimate source of income for Bays.  Based on everything learned throughout the investigation, Bays works full-time manufacturing and distributing synthetic marijuana and any possessions that he may have is derived from the proceeds of his illegal business.  The following acquisitions involve high value assets that investigators have been able to trace directly to the proceeds of Bays' illegal activity.

### Acquisition of 2012 Harley Davidson

59.     On March 6, 2012, Bays purchased a black 2012 Harley Davidson Sportster (VIN: 1HD1LF326CC424070) from River City Harley Davidson of Fort Wayne, by paying for the motorcycle with $12,773.49 in the form of Cashier's Check no. 871311 drawn on PNC bank.

### Acquisition of 2012 Chevrolet Silverado

60.     On June 1, 2012, Bays purchased a used black 2007 Ford Mustang (VIN: 1ZVFT82HX55222460) from Davco Auto of Ft. Wayne, Indiana, for $15,000. On June 7, 2012, Bays purchased a white 2012 Camaro Convertible (VIN: 2G1F3DJ2C9187589) from Kelly Chevrolet of Fort Wayne, Indiana by trading in the 2007 Ford Mustang (VIN: 1ZVFT82HX55222460) valued in trade at $13,253.00 and paying $31,000.00 in currency.

61.     On September 6, 2012, Bays purchased a black 2012 Chevrolet Silverado (VIN: 1GCNKSE08CZ129219) from Kelly Chevrolet of Fort Wayne, Indiana, by trading

in the white 2012 Camaro Convertible (VIN: 2G1F3DJ2C9187589) valued in trade at $31,000.00 and received $936.94 back.

### Acquisition of 2012 Yellow Camaro

62.     On January 9, 2012, Bays purchased a yellow 2012 Chevrolet Camaro SS (VIN: 2G1FK1EJ0C9155937) from Kelly Chevrolet of Fort Wayne, Indiana, by providing Kelley Chevrolet a $43,268 Cashier's Check obtained from PNC Bank and by paying $4,775.16 in currency.

### Acquisition of Red 2013 Chevrolet Camaro

63.     On September 6, 2012, Bays purchased black 2012 Camaro ZL1 (VIN: 2G1FZ1EP9D9801414) from Kelly Chevrolet of Fort Wayne, Indiana, by paying $63,520.58 in currency.

64.     On October 30, 2012, Bays purchased a red 2013 Chevrolet Corvette Gran Sport Coupe (VIN: 1G1YW2DW0D5104646) from Kelly Chevrolet of Fort Wayne, Indiana, by trading in the Black 2012 Camaro ZL1 (VIN: 2G1FZ1EP9D9801414) valued in trade at $53,163.00 and added an extra $9,500.00 in currency for the purchase.

65.     On December 8, 2012, Bays purchased a black 2013 Chevrolet Corvette Gran Sport Convertible from Kelly Chevrolet of Fort Wayne, Indiana, by trading in a red 2013 Chevrolet Corvette Gran Sport Coupe (VIN: 1G1YW3DW7D5106531) valued at $55,329.00 and adding an extra $10,500 in currency.

66.     On February 9, 2013, Bays purchased a red 2013 Chevrolet Camaro (VIN: 2G1FZ3DP8D9804995) from Kelly Chevrolet of Fort Wayne, Indiana, by trading in the

red 2013 Chevrolet Corvette Gran Sport Coupe (VIN: 1G1YW3DW7D5106531) valued at $58,500.00 and adding an extra $4,568.28 in currency.

Acquisition of 2013 Challenger

67.     On March 2, 2013, Bays acquired a 2013 Dodge Challenger (VIN: 2C3CDYBT6DH605024) from GlenBrook Dodge of Fort Wayne, Indiana, by trading in a black 2012 Chevrolet Silverado (VIN: 1GCNKSE08CZ129219) and paying an additional $35,624.

68.     On March 20, 2013, Bays traded the previously listed 2013 Dodge Challenger (VIN: 2C3CDYBT6DH605024) in at Glenbrook Dodge and purchased a purple 2013 Dodge Challenger (VIN: 2C3CDYCJ5DH671948).

Acquisition of 2013 Dodge Charger

69.     On April 27, 2013, Bays purchased a 2013 purple Dodge Charger (VIN: 2C3CDXGJ8DH684701) from Glenbrook Dodge for $45,635.

Acquisition of Property Located at 2519 Tillman Ft Wayne Indiana

70.     According to Allen County Public Records, Bays purchased a single-family residence from Sylvia Clark on May 7, 2012. This purchase was accomplished by Bays depositing $82,000.00 in currency into his PNC Bank account on May 4, 2012, and then acquiring a Cashier's Check from PNC which was used to pay off Sylvia Clark's mortgage held by Star Financial.

## Conclusion

71.     Based on the totality of the information contained herein, I have probable cause to believe that all the funds contained in each of these bank accounts represent proceeds from the sale of controlled substances and/or are funds intended to be furnished in exchange for a controlled substance.  Therefore, I have probable cause to seize and forfeit these funds pursuant to 21 U.S.C. § 881.

RICHARD C. GARDNER
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on the 23rd day of August, 2013.

IRMA C. RAMIREZ
United States Magistrate Judge
Northern District of Texas

**Affidavit in Support of Application for Search Warrant – Page 30 of 30**